**RAILWAY EXPRESS AGENCY, INCORPORATED**

v.

**GULF DEPARTMENT, DISTRICT BOARD OF ADJUSTMENT, BROTHERHOOD OF RAILWAY, AIRLINE AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES,** an unincorporated association, **W. A. Johnson,** individually and as General Chairman of said Gulf Department, Fulton Lodge No. 2040, Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, an unincorporated association, **D. S. Thurmon,** individually and as President of said Fulton Lodge, **George A. White,** individually and as Vice-President of said Fulton Lodge, **J. W. Parks,** individually and as Financial and Recording Secretary of said Fulton Lodge, **J. C. Ingram,** individually and as Chairman, Protective Committee of said Fulton Lodge, **Leroy Harris,** individually and as Secretary, Protective Committee of said Fulton Lodge, and **J. L. Carter, W. D. Compton, R. C. Dowdy, J. W. Cobb** and **H. D. Roberts,** individually and as Members, Protective Committee of said Fulton Lodge, and **N. C. Hamilton,** individually and as Chairman, Board of Trustees of said Fulton Lodge, Defendants.

Civ. A. No. 12844.

United States District Court
N. D. Georgia,
Atlanta Division.

Dec. 8, 1969.

Fisher & Phillips, Atlanta, Ga., for plaintiff.

Huie & Harland, Atlanta, Ga., for Brotherhood of Railway, Airline and Steamship Clerks, etc. & Paul J. Masson.

Beckham & McAliley, Thomas W. McAliley, Miami, Fla., for Gulf Department

Dist. Bd. of Adjustment B.R.A.C.; W. A. Johnson; Fulton Lodge No. 2040 B.R. A.C.; D. S. Thurmon; Geo. A. White; J. W. Parks; J. C. Ingram; Leroy Harris; J. L. Carter; W. D. Compton; R. C. Dowdy; J. W. Cobb; H. D. Roberts, and N. C. Hamilton.

Neal P. Rutledge, Miami, Fla., for defendants.

## ORDER

EDENFIELD, District Judge.

This action for injunctive relief was instituted on June 25, 1969, by Plaintiff Railway Express Agency (REA) to enjoin the allegedly unlawful picketing and work stoppage in which defendants engaged after REA, without prior notice to defendants, permitted Delta Air Lines to begin making certain Atlanta airport intraline express transfers which formerly had been made by REA's employees. A temporary restraining order issued on June 25th has twice been continued in force by consent of the parties —the last such time being July 22, 1969, when it was continued indefinitely following a hearing on the merits.

■ On September 22nd an order was issued granting the joint motion by REA and Defendants Brotherhood of Railway, Airline, and Steamship Clerks, Freight Handlers, Express and Station Employeees (BRAC), and Paul J. Masson, to dismiss without prejudice as to those two defendants. The case is now before the court for consideration of REA's motion for an injunction to preserve the jurisdiction of the Special Adjustment Board which plaintiff contends has jurisdiction over this dispute under the Railway Labor Act, upon defendants' counterclaim for an injunction to prevent

REA from continuing to turn over to Delta Air Lines the air-freight transfer work in question, and upon REA's motion to amend the complaint in order to conform the caption of that pleading to the class action allegations contained therein. The latter motion is a technical one to which defendants have not objected and which is clearly proper under the liberal amendment provisions of the Federal Rules. Accordingly, it will be granted.

■ Plaintiff REA, a nationwide express agency, is a "carrier" engaged in interstate commerce within the meaning of the Railway Labor Act (45 U.S.C. § 151 et seq.). Defendants are local unions and their officers, who are named as defendants both in their individual and official capacities and as representatives of the classes of REA employees against whom this suit is brought. Plaintiff alleges, and the court finds as a fact, that BRAC (International) is the exclusive bargaining agent for REA employees and has been certified as such by the National Mediation Board. The only union contracts covering these employees are those into which REA and BRAC have entered; there are no contracts between REA and any of the district or local union defendants involved in this case. It follows, therefore, that no district or local union has any statutory or contractual right to represent REA employees except as an agent of BRAC.[1]

The record shows that in April, 1969, REA and representatives of all air lines operating at the Atlanta airport met, at the latter's request, to discuss ways of decreasing the long delay in express processing which frequently occurred at the airport. As a result of that meeting, on May 21st REA offered the air lines

---

1. The court is not unmindful of the fact that when BRAC entered into this bargaining agreement it did so as the bargaining agent of REA's employees. And thus each employee does have a very real interest in the provisions of that contract. However, individual employees are not actual parties to the contract. The Fifth Circuit recognized this distinction in Illinois Central R. R. v. Moore, 112 F.2d

959 (5th Cir. 1940), rev'd, on other grounds, 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089, where it said that although the collective agreement contains a contract between union and carrier it is not itself a contract of employment but rather is only a basis agreed upon as mutually satisfactory for making contracts of employment.

the opportunity to transfer express between their own flights if certain specified conditions were met.[2] Delta accepted the offer and the new procedure was implemented on June 1, 1969.

The parties have stipulated that prior to June 1st the unions had not been contacted about the Delta express transfers but that on June 6th a group of union people met with REA's operations manager to discuss the situation, and on June 11th the general chairman of the Gulf District discussed the matter with REA's vice president, Mr. L. R. Howard. It is further stipulated that the union has not filed a grievance under the minor dispute provisions of the Railway Labor Act.

■ Defendants have taken the position that the work which REA has turned over to Delta is, under the terms of the collective bargaining agreement, work which only REA employees can do. It is therefore "scope work", defendants contend, and is a mandatory subject of bargaining. According to that view, the present dispute is a major one [3] in that by turning freight transfer work over to Delta, REA has attempted to change the terms of the bargaining agreement without following the procedures required by the Railway Labor Act.[4] Defendants' resort to self-help and the resultant work stoppage were therefore lawful, it is alleged, and protected from a federal court injunction by the provisions of the Norris-LaGuardia Act, 47 Stat. 70 (1932), 29 U.S.C. §§ 101-115.

It is undisputed that the work covered by the bargaining agreement is not expressly set forth in the agreement and that the question as to whether the freight transfer work which was turned over to Delta is "scope work" will have to be determined by reference to past practices. Defendants contend that since REA employees at the *Atlanta* airport have been performing the work in question for more than 20 years it is by implication scope work under the collective bargaining agreement. REA, on the other hand, contends that the bargaining unit is not local in nature and that not local past practices but national past practices must be used to determine what is included as scope work under the terms of the collective bargaining agreement between REA and BRAC—an agreement which covers REA employees on a nationwide basis. Under REA's view, decisions as to intraline freight transfer procedures lie within the area of management prerogative specifically conferred upon REA by the agreement. And in support of that contention REA cities numerous instances in which intraline transfer procedures similar to those now followed by Delta at the Atlanta airport have been used at other airports throughout the country.

The national character of labor relations in the railroad industry was noted by the United States Supreme Court in California v. Taylor, 353 U.S. 353, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957). That case dealt with a question which does not arise in this case, of course (*i. e.*, whether the Railway Labor Act applies to state-owned railroads), but much of the Court's reasoning appears to be generally applicable to all cases arising under the Railway Labor Act. The Court in

---

2. There is a dispute as to the conditions imposed but that issue cannot and need not be decided by this court.

3. Major disputes are those concerned with the formation of collective bargaining agreements or with efforts to secure such agreements; they look to the acquisition of rights for the future rather than to rights which vested in the past. Minor disputes, on the other hand, arise where there is an existing agreement and there has been no effort to bring about a formal change in terms or to create

a new agreement, but the dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. *Elgin, Joliet & Eastern Ry.* v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

4. 45 U.S.C. § 151, et seq.; *see also* Elgin, Joliet & Eastern Ry. v. Burley, supra n. 2; Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 377-378, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).

*Taylor* emphasized that agreements in the railroad industry uniformly are negotiated for, and regulate rates of pay and working conditions of, employees in an entire railroad system.[5] With this in mind, it clearly cannot be said that there is no merit to REA's contention that the implied terms of the bargaining agreement in the case must be found by looking to the work traditionally performed by REA employees on a national rather than merely on a local level.

The record shows that in June 1969, there were at least two conferences between REA officials and representatives of the disgruntled employees. Furthermore, the court notes that *both* parties to the collective bargaining agreement have taken the position that the dispute will be controlled by interpretation of the bargaining agreement and that the dispute should be presented to the Special Adjustment Board. Although defendants take issue with that view they nevertheless rely upon their own interpretation of the contract to show that REA has attempted unilaterally to change the agreement.

■■ A dispute of this kind could be considered a major one only if the existing agreement contains express or implied provisions inconsistent with REA's proposals. "It is a minor dispute if * * * [the agreement contains] a clearly governing provision [or] if what the railroad seeks to do is supported by customary and ordinary interpretations of the language of the agreements." Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, 307 F.2d 21, 34 (2d Cir. 1962). Since the collective bargaining agreement in question might reasonably be interpreted as plaintiff contends, the court finds that the primary issue in the case is one of contract interpretation. The dispute therefore is a minor one and

the issue must be presented to the Special Adjustment Board created by the parties to the collective bargaining agreement. Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, supra at 36.

Accordingly, REA's motion to amend the complaint is GRANTED and the temporary restraining order previously issued by this court shall be continued as a permanent injunction to protect the jurisdiction of the Special Adjustment Board which has jurisdiction of this dispute.

It is so ordered.

---

5. The Court quoted the House Committee on Interstate and Foreign Commerce, as follows: "Railroads and airlines are direct instrumentalities of interstate commerce; the Railway Labor Act requires collective bargaining on a system-wide basis; agreements are uniformly nego-tiated for an entire railroad system and regulate the rates of pay, rules of working conditions of employees in many States * * *. H.R.Rep. No. 2811, 81st Cong., 2d Sess. 5." California v. Taylor, 353 U.S. 553, n. 15 at 567, 77 S.Ct. 1037, n. 15 at 1045 (1957).